UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
DANIEL MILLER, and MARY MILLER,
                     Plaintiffs,

                                   <u>MEMORANDUM & ORDER</u>
       -against-               21-CV-2949 (JS)(AKT)

ANDRE SMITH, Parole Officer; TANYA
HUBBARD, Senior Parole Officer;
TINA M. STANFORD, Chairwoman, Board
of Parole; NYSDOCCS, ROGER TRAYNOR,
Senior Offender Rehabilitation
Coordinator at Franklin Correctional
Facility; COURTNEY LEONARD, Senior
Offender Rehabilitation Coordinator
at Franklin Correctional Facility;
MS. MORALES, Offender Rehabilitation
Coordinator at Green Haven Correctional
Facility; COUNTY OF NASSAU; JOHN DOE,
Commissioner of the Nassau County
Department of Social Services; ANTHONY
ANNUCCI, Acting Commissioner of DOCCS;
A. RUSSO, Superintendent of the Green
Haven Correctional Facility,

                     Defendants.
-------------------------------X
APPEARANCES:
For Plaintiff:        Steven Bandel, Esq.
                    Bandel & Bandel, LLP
                    666 Old Country Road, Suite 306
                    Garden City, New York  11530

For Defendant
Stanford:             Helena Ann Lynch, Esq.
                    NYS Office of The Attorney General
                    Nassau Regional Office
                    200 Old Country Road, Suite 240
                    Mineola, New York  11501

For Defendant
Annucci:              Toni E. Logue, Esq.
                    NYS Office of The Attorney General
                    Nassau Regional Office
                    200 Old Country Road, Suite 460
                    Mineola, New York  11501

For Defendant
County of Nassau:      Liora M. Ben-Sorek, Esq.
                       Nassau County's Attorney's Office
                       One West Street
                       Mineola, New York  11501

All Other
Defendants:            No appearances.


SEYBERT, District Judge:

On June 22, 2021, the Court issued an Omnibus Order[1] wherein it deferred ruling on the portion of the Injunction Application of Plaintiffs Daniel Miller ("Miller") and Mary Miller ("Mary") seeking preliminary injunctive relief. (See Injunction Application, ECF No. 3; see also Omnibus Order.)  Presently, before the Court is the deferred portion of the Injunction Application.   The State Defendants, defined infra, object.   For the reasons that follow, the balance of the Injunction Application is DENIED.[2]

---

[1]  The Court assumes the parties' familiarity with the terms of art defined in the Court's June 22, 2021 Omnibus Order (ECF No. 16), which terms are incorporated herein.  The Court further notes that the Injunction Application was filed in the form of a proposed Order to Show Cause.

[2]  In deferring ruling on that portion of the Injunction Application seeking preliminary injunctive relief, the Court also stated that it would wait until after the Defendants had had an opportunity to respond to Plaintiffs' Injunction Application to "determine whether it is necessary to schedule a hearing on this matter."  (Omnibus Order, Conclusion, ¶(C)(2).)  "While a hearing is generally required on motion for preliminary injunction, it is

2

BACKGROUND[3]

I.   Relevant Factual Background

Plaintiffs, Daniel Miller, a level 3 sex offender who completed his sentence on April 15, 2021 and is awaiting housing that complies with the restrictions of the Sexual Assault Reform Act ("SARA"), and his mother, Mary Miller, assert various constitutional challenges, pursuant to 42 U.S.C. § 1983, to certain decisions regarding . . . Miller's post-release housing.   Miller is currently housed at the Residential Treatment Facility ("RTF") in Green Haven Correctional Facility, where he is on a waitlist for a shelter placement that complies with the prohibition in SARA against certain sex offenders entering within 1,000 feet of a school.

(State Response, ECF No. 29, at 1; see also Singletary Decl., ECF No. 31-2, ¶¶5-6 (averring, inter alia, that Miller is on waiting list for SARA-compliant housing, but that "there are other SARA-restricted parolees who have been awaiting housing for a longer

───────────────

not required in all cases, such as cases in which the affidavits submitted by the parties provide an adequate basis for the court's decision (and the most significant factors on which the injunction was based would have remained essentially unchanged by any additional evidence at a hearing)."   Weisshaus v. Cuomo, 512 F. Supp. 3d 379, 386 n.3 (E.D.N.Y. 2021) (cleaned up) (quoting Hafez v. City of Schenectady, No. 1:17-CV-0219, 2017 WL 6387692, at *5 (N.D.N.Y. Sept. 11, 2017)).   Having considered the Defendants' responses and Plaintiffs' reply thereto, "[h]ere, the filings provide an adequate basis for the Court's decision."   Id. Accordingly, the Court declines to hold a hearing on this matter.

[3]   The Court also assumes the parities' familiarity with the underlying facts leading to the present case.

period of time than he").)   More particularly, Miller had proposed Mary's home for his post-release housing placement.   However, Defendant Smith, the parole officer tasked with investigating that proposal recommended that Miller's placement in Mary's home be denied for two reasons.   (See Smith Decl., ECF No. 31, ¶7.)   First, "it would be inappropriate and unsafe for the elderly, disabled Mary Miller to have as her caretaker someone[, i.e., Miller,] who had previously stolen $34,000 from her."   (Id. at ¶8; see also id. at ¶¶4-7).   Second, the sexual assault of which Miller was convicted took place in Mary's home.   (See id. at ¶11 ("[Miller's] underage victim was drugged and was physically helpless while . . . Miller sexually assaulted him in one of the bedrooms in [Mary]'s home.").)   Thus, Defendant Smith determined "it would be detrimental to the safety of Mary Miller and of the community to allow Daniel Miller to reside in the home where he committed sexual crimes and where he would be the caretaker for his elderly, disabled mother from whom he had previously stolen $34,000."   (Id. at ¶14.)   Defendant Hubbard, a senior parole office who was Smith's supervisor and whose duties included reviewing investigations of proposed housing placements for individuals on post-release supervision, including Miller's placement, agreed with Smith's reasoning and ultimate recommendation that Miller not be placed in

Mary's house post-release.   (Hubbard Decl., ECF No. 31-1.)

II.  <u>Plaintiffs' Injunction Application and Relevant Procedural
     History</u>

When Plaintiffs Miller and Mary commenced this § 1983 civil rights action on May 25, 2021, they also filed their Injunction Application.  Of significance, they sought a mandatory injunction that would direct:

> Defendants STANFORD, SMITH, HUBBARD[,] and MORALES  [(hereafter, collectively, the "Injunction Defendants")] to either:
>
>> a. IMMEDIATELY Release Plaintiff DANIAL MILLER and deliver him to the Nassau County Department of Social Services for placement in a SARA-Compliant Shelter or Motel, or, in the alternative;
>> b. IMMEDIATELY approve Plaintiff DANIEL MILLER's residence with his mother, Plaintiff MARY MILLER, to care for her extraordinary medical needs; . . . .

(Injunction Application at 2, ¶1(a)&(b).)   The Injunction Application was supported by several affidavits, including from Miller and Mary.  (<u>See</u> ECF Nos. 3-2 & 3-1, respectively.)

On June 22, 2021, this Court issued the Omnibus Order, which, among other things (1) denied the Injunction Application to the extent it sought a TRO (<u>see</u> Omnibus Order at 7-8), and (2) deferred ruling on the portion of the Injunction Application that sought a preliminary injunction pending proper notice (<u>see</u> <u>id.</u> at

6-7; see also id. at 7 ("[T]he Court defers ruling on this portion of [the] Injunction Application until such time as Defendants have received notice of same and have had an opportunity to respond.")). Plaintiffs were given until July 9, 2021 to serve the Defendants with, inter alia, the Injunction Application, and Defendants were given until July 23, 2021 to show cause why the requested preliminary injunction should not be issued.  (See id. at 8-9.)

On July 2, 2021: (1) Attorney Steven Bandel (hereafter, "Counsel Bandel") filed (a) a Notice of Appearance on behalf of Plaintiffs (see ECF No. 17), and (b) proposed summonses for the Injunction Defendants, as well as for Defendants Taynor, Leonard, Nunziata,[4] Annucci, and A. Russo (hereafter, collectively with the Injunction Defendants, the "State Defendants"), and County of Nassau (hereafter, the "County Defendant"; together with the State Defendants, the "Defendants") (see ECF No. 18 at 2-3 ("Rider 'A' to Summons") (hereafter, the "Summons Rider")); and (2) the Court filed Miller's June 28, 2021 pro se Motion for Reconsideration, addressing the denial of his TRO request (hereafter, the "Reconsideration Motion").  (See ECF No. 19.)

---

[4]  Nancy Nunziata is the Commissioner of Social Services, the "John Doe Commissioner, Nassau County DSS" initially named in Plaintiffs' Complaint.

On July 6, 2021, summonses were issued for the Defendants named in the Summons Rider.  (See ECF No. 21.)  On July 21, 2021, counsel for the State Defendants advised the Court, inter alia, that three of the four Injunction Defendants had not yet been served and inquired whether the Court "wishe[d] to adjourn the [OSC] response date to allow Plaintiffs additional time to serve Defendants, at least those named in the [Injunction Application]." (State Defs.' Ltr., ECF No. 26, at 1 ("The undersigned inquired of Plaintiff's counsel, notifying him that we have no record of service on several of the Defendants, and in response counsel stated that Smith and Hubbard have not been served.  Counsel further stated he believed Stanford had been served but he was awaiting proof.  The undersigned then asked if Plaintiffs planned to serve Smith and Hubbard before Friday[, i.e., July 23, 2021], and whether Morales had been served, but thus far has received no response." (citations omitted)).)  "[T]he Court decline[d] to take such action."  (July 22, 2021 Elec. ORDER.)  Notably, Counsel Bandel never requested any extension of the Court's service deadline.  (See Case Docket, in toto.)  Review of the record indicates the Injunction Defendants and other Defendants were served by mail on July 6, 2021.  (See Thomas Aff. of Serv., ECF No. 34-1 (filed July 23, 2021).)

7

III. <u>The Defendants' OSC Responses</u>

The County Defendant responded to the Court's OSC stating that "[b]ecause Daniel Miller is currently committed to the custody of New York State, specifically its Department of Corrections and Community Services [("DOCCS")], the County of Nassau has no authority to take a position with respect to his request for release." (County Response, ECF No. 28, at 1.) As a result, the County Defendant "defers" to the State Defendants and "this Court for a ruling on the preliminary injunction." (<u>Id.</u>; <u>see also</u> <u>id.</u> at 2 ("In light of the County's lack of jurisdiction to make release determinations over incarcerated individuals, the County defers to this Court to rule on the preliminary injunction. And, in the event that Daniel Miller is released, the County defers to the DOCCS Division of Parole to ensure that whatever housing placement Miller has is safe for the community.").)

The State Defendants responded and initially argue that, as to the Injunction Defendants, Plaintiffs are not entitled to injunctive relief as against Stanford or Morales since neither of those defendants have any authority to implement the relief sought.[5] (<u>See</u> State Response, ECF No. 29, at 10 (arguing that

---

[5] The State Defendants also argued that, as of July 22, 2021, the date of their State Response, there was no record of service upon Defendants Smith, Hubbard, or Morales. (<u>See</u> State Response at

"[a] prerequisite to obtaining injunctive relief is demonstrating that the defendants have the authority to provide the relief requested").)

The State Defendants further contend that "Plaintiffs fall far short of showing a clear or substantial likelihood of success on their claims," i.e., the alleged violation of Miller's constitutional rights under the Fourteenth, Eighth, and First Amendments[6] caused by his continued placement in the RTF while awaiting appropriate and SARA-compliant housing (hereafter, the "Alleged Offending Circumstance"), and the alleged violation of Mary's Fourteenth and First Amendment rights caused by the same Alleged Offending Circumstance. (Id. at 11.) They advance three arguments in support of this position.

First, the State Defendants maintain that Plaintiffs fail to show a likelihood of success in challenging the requirement that Miller must wait for SARA-compliant shelter placement

---

10.) Given Plaintiffs' subsequent filing of the Thomas Affidavit of Service (see ECF No. 34-1), which has not been disputed, for purposes of ruling upon the remaining portion of the Injunction Application only, the Court assumes that proper service has been effectuated upon the Injunction Defendants. (Cf. Reply Aff., ECF No. 35, ¶7 (asserting that service upon Defendants Annucci and/or Stanford "is a proper effectuation of service upon the employees and agents of DOCCS, including Smith, Hubbard and Morales").)

[6]   The Court addresses the Amendment arguments in the order presented by the State Defendants in their Response memorandum.

9

"because there are other SARA-restricted parolees awaiting shelter housing that have waiting longer than he" and Miller's continued wait in the RTF until he clears the shelter housing waitlist does not violate his constitutional rights. (See id. at 11; see also id. at 12 (arguing no violation of Plaintiffs' Fourteenth Amendment due process rights); id. at 13 (arguing no violation of Miller's Eighth Amendment rights or First Amendment freedom of association rights); id. at 14 (arguing no violation of Miller's First Amendment free speech rights).) Second, the State Defendants contend that Plaintiffs fail to show a likelihood of success in challenging the denial of Miller's post-release placement into Mary's home because the denial does not implicate any constitutional right. (See id. at 15.) Even if it did, however, the State Defendants assert "the denial would easily pass rational basis review, the applicable standard" (id.) since this housing restriction is "tailored to the circumstances of [Miller's] convicted offense[s], his criminal history, and his pertinent characteristics." (Id. at 16 (internal quotation marks and citation omitted); see also id. at 17 ("The rejection of the proposal that . . . Miller reside with his mother is rationally related to the legitimate government interest of protecting the public, particularly vulnerable victims such as Miller's mother[,

Mary,] and others like his underage sexual assault victim.").) Third, the State Defendants argue that since Mary is only incidentally affected by the Alleged Offending Circumstance, she lacks the requisite standing to maintain her § 1983 claims; therefore, Mary cannot demonstrate a likelihood of success on any of her claims. (See id. at 17-18.)

Moreover, the State Defendants aver that Plaintiffs cannot meet their preliminary injunction burden since they have not made the requisite showing of irreparable harm. While acknowledging that "an actual constitutional injury may cause irreparable harm," the State Defendants argue that Plaintiffs merely allege constitutional injuries, which is insufficient to convincingly show irreparable harm warranting injunctive relief. (Id. at 18 ("Because Plaintiffs merely allege constitutional injuries, and indeed fail to state a plausible claim under any of the constitutional provisions they cite, they fall far short of the required convincing showing.").)

Finally, the State Defendants assert that Plaintiffs are "not entitled to injunctive relief because the equities and public interest overwhelmingly favor maintaining the status quo while Miller, a level 3 sex offender, awaits housing that is appropriate and SARA compliant." (Id. at 19.) In supporting this argument,

11

the State Defendants contend that "it would not serve the public interest to allow Miller to displace another parolee on the waitlist for shelter housing" as it "would be unfair and would undermine the orderly cooperative system that DOCCS and county social service offices have established to ensure fundamental fairness."  (Id.)  They raise the additional argument that "it would gravely disserve the public interest to create a situation where Miller would be the primary caretaker for an elderly disabled woman from whom he previously stole $34,000" or "have opportunities to lure other victims into the home" where Miller "committed a violent sexual assault against an underaged physically helpless victim."  (Id. at 19-20.)  Accordingly, the State Defendants ask that Plaintiffs' request for a preliminary injunction be denied.

IV.  The Plaintiffs' Reply

> In reply, Counsel Bandel states, inter alia:
>
> The brunt of this Reply is to respond to defendants' stated position that there should not be injunctive relief granted in the form of releasing Mr. Miller to his mother's residence or elsewhere due to defendants' violation of his due process rights in defendant's [sic] denial of his residence with his mother.  It is strongly contended that defendants' denial of Mr. Miller's request to reside with his mother[, Mary,] was arbitrary and capricious, and there is no rational relationship to a government interest.

(Reply Aff., ECF No. 35, ¶4.)[7]  Indeed, Plaintiffs do not address Miller also being placed on a waiting list for appropriate post-release shelter housing.  (See id., in toto.)

While acknowledging that their Fourteenth Amendment due process claims are subject to the rational basis standard of review, Plaintiffs maintain that denying approval of Mary's home for Miller's post-release placement is arbitrary when "Miller had previously been paroled to the same residence with his mother,

_____

[7]  In advancing his reply, Counsel Bandel invites the Court to refer to Miller's pro se submissions, stating:

> Plaintiff DANIEL MILLER's pro se papers are significant in their recitation of the law on multiple issue presented and the Court is respectfully referred to the moving papers with regard to all issues raised by the defendants, rather than repeat what is stated profoundly therein.

(Reply Aff. ¶3.)  Notably, though, Bandel offers no citation to the moving papers to which he alludes.  In the absence of such guidance, the Court is at a loss as to what specific law or arguments Counsel Bandel would have the Court consider.  "Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.  'Judges are not like pigs, hunting for truffles buried in' the record."  Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys., 309 F.3d 433, 436 (7th Cir. 2002) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).  Nonetheless, in addition to the Reply Affirmation, in ruling upon the Plaintiffs' request for preliminary injunctive relief, the Court has also considered the Injunction Application and all the corresponding supporting affidavits filed by Miller, pro se.

despite that [2006] conviction concerning theft from his mother." (Id. ¶13; see also id. ¶14 ("Not approving the residence now, fifteen years after the theft conviction, when [Mary]'s residence had been approved in the past, closer in time to the subject theft, is wholly arbitrary."); see also id. ¶23 ("The denial of residence, fifteen years after the subject theft, when (1) the residence had previously been acceptable [in 2007], and (2) [Miller] is permitted in the house anytime outside of curfew hours, is completely arbitrary and absurdly and irrationally applied to achieve any State purpose that defendants can try to attach to.").) They also contend that as to Miller's conviction for sexual assault of a minor "[d]enying [Miller]'s residence with his mother has no rational relation to the State's interest of preventing crime" and that "[t]he residence was entirely coincidental and in no way a rational cause of the crime." (Id. ¶26; see also id. ¶27 (same).)

Plaintiffs do not meaningfully reply to the State Defendants' assertion that because Plaintiffs cannot prove constitutional injuries, they have failed to show irreparable harm. (See id. ¶29 ("Plaintiffs strongly dispute that argument and refer the Court to all papers submitted in support of the herein petition."); cf. supra note 7.) In response to the final elements of the preliminary injunction standard, i.e., weighing

the equities and assessing the public interest, Plaintiffs contend "[i]t should not be offensive to the public that a person who served his sentence now be released." (Id. ¶33.) More specifically, Plaintiffs assert "[i]t is in the public interest for family members to take care of their elderly parents rather than for the parents to be placed in nursing homes at the expense of the State via Medicare and Medicaid," and "the definite consequence of allowing . . . Miller to reside with and care for [Mary] significantly outweighs the small likelihood that a theft occurs again." (Id. ¶¶34, 35.) Plaintiffs further baldly contend that Miller's non-release "is the result of defendants completely ignoring and sabotaging . . . Miller's efforts to find housing." (Id. ¶36; see also id. ¶38.) Finally, Plaintiffs advance the argument that "the public would be offended not by . . . Miller's release, but rather by the insufficiency of services provided by defendants for people like . . . Miller and by defendants [sic] overall failure to sufficiently inspect and approve residences for . . . Miller." (Id. ¶ 39.)

### DISCUSSION REGARDING PRELIMINARY INJUNCTIVE RELIEF

I.   The Legal Standard

> A party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the

15

merits to make them a fair ground for
litigation and a balance of hardships tipping
decidedly toward the party requesting the
preliminary relief." Citigroup Global Mkts.,
Inc. v. VCG Special Opportunities Master Fund
Ltd., 598 F.3d 30, 35 (2d Cir.2010). The
burden is even higher on a party like [movant]
that seeks "a mandatory preliminary injunction
that alters the status quo by commanding some
positive act, as opposed to a prohibitory
injunction seeking only to maintain the status
quo." Id. at 35 n.4 (internal quotation marks
omitted). A mandatory preliminary injunction
"should issue only upon a clear showing that
the moving party is entitled to the relief
requested, or where extreme or very serious
damage will result from a denial of
preliminary relief." Id. (internal quotation
marks omitted).

Cacchillo v. Insmed, Inc., 638 F.3d 401, 405-06 (2d Cir. 2011);

see also Demirayak v. City of N.Y., 746 F. App'x 49, 51 (2d Cir.

Aug. 24, 2018) (summary order) ("A heightened standard applies

when a movant seeks a preliminary injunction that either alters

the status quo or would provide the ultimate relief sought in the

underlying action." (citing Tom Doherty Assocs., Inc. v. Saban

Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995)). In assessing a

request for preliminary injunctive relief, "[i]rreparable harm is

'the single most important prerequisite for the issuance of a

preliminary injunction.'" Demirayak, 746 F. App'x at 51 (quoting

Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp., 719 F.2d 42,

45 (2d Cir. 1983)). A district court has broad discretion in

16

determining whether to grant or deny preliminary injunctive relief.  See Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 511 (2d Cir. 2005).

Here, Plaintiffs ask for a mandatory preliminary injunction because they seek proactive action by the Injunction Defendants, i.e., that the Injunction Defendants either immediately release Miller to Nassau County DSS or immediately approve his placement with his mother, Mary.  (See Injunction Application at 2, ¶1(a)&(b).)  Therefore, the Court employs the heightened standard of a clear showing of entitlement to analyze the relief sought.  See, e.g., Our Wicked Lady LLC v. Cuomo, No. 21-CV-0165, 2021 WL 915033, at *3 (S.D.N.Y. Mar. 9, 2021) (instructing that where the movant seeks a mandatory preliminary injunction, "the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits" (quoting Yang v. Kosinski, 960 F.3d 119, 127-28 (2d Cir. 2020)).

II.  The Instant Case

A. The Authority of the Injunction Defendants

As an initial matter, "[a]n injunction may issue only in circumstances where the state official has the authority to perform the required act."  Loren v. Levy, No. 00-CV-0787, 2003 WL 1702004,

17

at *11 (S.D.N.Y. Mar. 31, 2003) (cleaned up), aff'd, 120 F. App'x 393 (2d Cir. 2005); see also, e.g., Briscoe v. Rice, No. 11-CV-0578, 2012 WL 253874, at *4 (E.D.N.Y. Jan. 27, 2012)(same); Zappulaa v. Fischer, No. 11-CV-6733, 2013 WL 1387033, at *10 (S.D.N.Y. Apr. 5, 2013) (same).   Here, Plaintiffs have not established, clearly or otherwise, that Defendants Stanford or Morales have the authority to affect the injunctive relief sought. Indeed, they fail to address this threshold issue at all. Conversely, the State Defendants have established that both Defendants Stanford and Morales lack such authority.   As to Defendant Stanford, the State Defendants have demonstrated that Stanford: is the Chairwoman of the N.Y.S. Board of Parole ("BOP") who supervises "many administrative functions of the [BOP] and perform[s] all other lawful duties including . . . setting the conditions of release"; "do[es] not have the authority to instruct Community Supervision as to whether to approve or deny housing" or "to override housing decisions"; and, "h[as] not been involved in any decision as to whether to approve or deny proposed residences for Daniel Miller." (See Stanford Decl., ECF No. 31-4, ¶¶2, 6, 8; see also id. ¶4 ("The BOP is not involved in decisions of whether to approve or deny housing for parolees or individuals who are under community supervision.").)   As to Defendant Morales, the

18

State Defendants have demonstrated, Morales: is an Offender Rehabilitation Coordinator for DOCCS whose responsibilities include collecting pertinent information from inmates, family, and friends, regarding proposed housing placement and entering such information into a database for further investigation as to SARA compliance; "was not involved in the decision to deny placement of Mr. Miller at his mother's house"; "will not be involved in the decision to approve" Miller for placement in a shelter; and, is "not involved in decisions as to whether to approve or deny proposed community housing of inmates." (See Morales Decl., ECF No. 31-3, ¶¶2, 4, 11-14.)   Thus, in the absence of any showing that Defendants Stanford or Morales have the authority to perform the injunctive relief sought, Plaintiffs motion for a preliminary injunction directed towards Defendants Stanford and Morales is denied.

B. The Constitutional Claims

Regarding the "irreparable harm" component of the preliminary injunction analysis, as recently stated by District Judge Cogan of this District:

> Although the Second Circuit has stated that "the alleged violation of a constitutional right . . . triggers a finding of irreparable harm," Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996), "the favorable presumption of irreparable harm arises only after a plaintiff

19

> has shown a likelihood of success on the merits of the constitutional claim," Page v. Cuomo, 478 F. Supp.3d 355, 364 (N.D.N.Y. 2020) (citing Jolly, 76 F.3d at 482).  "Thus, when a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, 'the two prongs of the preliminary injunction threshold merge into one.'"   Id. (quoting Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).

Weisshaus v. Cuomo, 512 F. Supp. 3d 379, 390 (E.D.N.Y. 2021).  As stated, supra, Plaintiffs' request for relief is based upon alleged violations of their constitutional rights.  Thus, the Court turns to assessing Plaintiffs' constitutional claims.

1. Mary Lacks Standing to Bring Her Constitutional Claims

The State Defendants argue that because Mary does not have standing to assert her § 1983 claims, she cannot show a likelihood of success on any of those claims.  Their argument is premised on the notion that "[a] parent lacks standing to bring individual claims under § 1983 based upon a deprivation of a child's constitutional rights because only the person toward whom the state action was directed, and not those incidentally affected may maintain a § 1983 claim." Nguyen v. Milliken, No. 15-CV-0587, 2016 WL 2962204, at *7 (E.D.N.Y. May 20, 2016) (cleaned up); see also Morgan v. City of N.Y., 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) (finding a parent "lacks standing to bring individual claims under § 1983 based upon a deprivation of [a child's] constitutional

rights" because "only the person toward whom the state action was directed, and not those incidentally affected may maintain a § 1983 claim" (cleaned up)); see generally Horton v. Bd. of Educ. of the Sherburne-Earlville Cent. Sch. Dist., No. 15-CV-0782, 2016 WL 2354266, at *2 (N.D.N.Y. May 4, 2016) (dismissing § 1983 claim asserted by a parent for lack of standing); Naples v. Stefanelli, 972 F. Supp. 2d 373, 385 (E.D.N.Y. 2013) (same).  Plaintiffs have not offered any counterargument to the State Defendants' arguments regarding standing.  Having reviewed the Plaintiffs' Verified Complaint and other submissions, the Court agrees that Plaintiffs have not established that Mary possesses the requisite standing to bring her claims of constitutional violations; in turn, Mary is unable to demonstrate a likelihood of success on any of those claims.  Hence, Mary is not entitled to the requested preliminary injunctive relief.  Even if, argunendo, Mary were to have standing, for the reasons discussed infra, the Court would still find that Mary is not entitled to preliminary injunctive relief.

   2. Plaintiffs' Fourteenth Amendment Due Process Claims

   Recently, the New York State Court of Appeals has determined that there is no constitutional violation arising from "the practice of temporarily confining level three sex offenders in correctional facilities, after the time they would otherwise be

released to parole or postrelease supervision (PRS), while they
remain on a waiting list for accommodation at a shelter compliant
with Executive Law § 259-c(14)." People ex rel. Johnson v.
Superintendent Adirondack Corr. Facility, 36 N.Y.3d 187, 192 (N.Y.
2020). Noting that "New York statutes allow DOCCS to place a
SARA-restricted sex offender temporarily in an RTF, until SARA-
compliant housing is identified," in Johnson, the Court of Appeals
addressed whether that was offensive to the U.S. Constitution.
Id. at 197. It first considered and rejected a Fourteenth
Amendment substantive due process challenge based upon claims that
the petitioner's "confinement to an RTF in prison-like conditions,
after the maximum expiration date of his determinate sentence had
passed, violated his fundamental liberty interest," where, as is
the case here, the petitioner "was subject to the SARA residency
requirement," and his "assignment to an RTF was based on a
mandatory condition of his PRS—a condition that DOCCS can require
him to satisfy while he is under its supervision." Id. at 200-01
(citation omitted). In reaching this conclusion, the Court of
Appeals engaged in a thorough Fourteenth Amendment substantive due
process analysis and reasoned that to treat the petitioner's
"claimed right to release as a fundamental constitutional liberty
interest would be self-defeating" given that "[t]he law

22

unquestionably provides that a defendant sentenced to PRS who violates any condition of supervision . . . at any time during PRS may be reincarcerated." Id. at 200 (cleaned up). Therefore, "[r]equiring an individual who has not satisfied SARA's housing restrictions to remain in an RTF until SARA-compliant housing is identified does not violate a fundamental liberty interest." Id. at 201. The Court of Appeals explained that the petitioner's "substantive due process claim must . . . be understood as asserting non-fundamental constitutional rights [making] . . . it . . . subject to rational basis review[.]" Id. at 202. Under this "undemanding level of judicial review,"[8] "[c]onfining level three sex offenders who are on a waiting list for SARA-compliant shelter housing is not so unrelated to the achievement of any combination of legitimate purposes as to be irrational." Id. at 203 (cleaned up).

Hence, in the instant case, as articulated by the New York Court of Appeals and as conceded by Plaintiffs, the Court

---

[8]   The Court of Appeals instructed that under the applicable rational basis test "the challenged confinements must be evaluated by means of the most relaxed and tolerant form of judicial scrutiny" and "courts may even hypothesize the Legislature's motivation or possible legitimate purpose." Id. at 202 (cleaned up); see id. (further stating, "[a]t bottom, the rational basis standard of review is a paradigm of judicial restraint") (citation and quotation marks omitted)).

engages in a rational basis analysis review of Plaintiffs' Fourteenth Amendment claims. Under this standard, to the extent Plaintiffs challenge Miller's continued placement in the RTF while he is on a waitlist for shelter housing as violating their Fourteenth Amendment due process rights, such placement is rationally related to the State's legitimate governmental interest in keeping Miller more than 1,000 feet away from schools. Therefore, Plaintiffs cannot show a likelihood of succeeding on their due process claims.

Plaintiffs further complain that the rejection of Miller's proposal of Mary's home for his post-release housing placement was arbitrary and capricious. In support of this position, Plaintiffs rely upon Matter of Telford v. McCartney, 155 A.D.3d 1052 (N.Y. App. Div., 2d Dep't 2017). (See Miller Ltr., ECF No. 25.) In Telford, the respondent, McCartney, the Suffolk County Chief of DOCCS, denied petitioner's proposal of his mother's home for his post-release residence despite three parole officers having inspected the family home on two different occasions and finding it suitable. See id. McCartney "cit[ed] concerns about the safety of the petitioner and his family, as well as the community and parole officers, which arose from unspecified community opposition." Id. at 1053. New York's Appellate

24

Division, Second Department, reversed the judgment and remanded it

for reconsideration, stating:

> Under the circumstances of this case,
> speculation by DOCCS about possible community
> efforts to exclude the petitioner from
> otherwise suitable housing and about the
> petitioner's potential response to such
> efforts is not a rational basis for denial of
> otherwise suitable housing. . . . As the
> respondents have articulated no other basis
> for denying approval of the proposed
> residence, the respondents' refusal to approve
> the Telford home as a suitable postrelease
> residence was arbitrary and capricious, as the
> determination bears no rational relation to
> the petitioner's past conduct or likelihood
> that he will re-offend . . . .

Id. at 1054 (internal citations omitted).

Plaintiffs' reliance on Telford is misplaced as Miller's

case is readily distinguishable.  First, in the instant case, the

parole officer, Defendant Smith, did not find Mary's home suitable

for Miller's post-release placement "because it would be

detrimental to the safety of Mary . . . and of the community to

allow . . . Miller to reside in the home where he committed sexual

crimes and where he would be the caretaker for his elderly,

disabled mother from whom he had previously stolen $34,000."

(Smith Decl. ¶14.)  Smith's supervisor, Defendant Hubbard, agreed

with Smith's reasoning and recommendation.  (Hubbard Decl. ¶14.)

Second, the reasons for recommending denial of Mary's home for

Miller's post-release placement are rationally related to Miller's past conduct and the likelihood that he will re-offend. As to Mary: Given her advanced age, disabilities, and dependence upon others for her physical care, it is not unreasonable to be concerned that she could easily fall prey to further theft by Miller. It is of no moment that Miller had previously been released to Mary's home after his 2006 conviction for his theft from Mary, since at that time Mary was younger and not suffering the level of debilitating physical restraints she faces today. Moreover, it is not unreasonable to conclude that it would be unsafe for the community if Miller were to reside in Mary's home post-release given that the sexual assault of a minor previously occurred in that home, in light of Mary's age and disabilities, which, taken together, present an environment where Miller could readily re-offend. Third, there has been no indication here regarding possible community efforts to exclude Miller from Mary's home. Instead, under the circumstances of this case, denial of Mary's home for Miller's post-release placement is rationally related to his past conduct and to the likelihood of him re-offending. As such, Plaintiffs are unable to clearly show a likelihood of success on their due process claims.

3. Miller's Eighth Amendment Claim

In Johnson, the New York State Court of Appeals Court also considered a petitioner's Eighth amendment cruel and unusual punishment claim and held that confinement of a level 3 sex offender in an RTF beyond the maximum expiration date was not done in deliberate indifference to the petitioner's liberty interest. See Johnson, 36 N.Y.3d at 204-06.   There, the DOCCS declined petitioner's request to release him to the New York City Department of Homeless Services shelter system.   See id. at 205.   The Court of Appeals ruled that DOCCS's retention of the petitioner in an RTF pending the availability of SARA-compliant shelter did not constitute deliberate indifference given a parole officer's statutory duty "to actually supervise the [petitioner-]parolee, which requires knowledge . . . that the parolee's residence is not in violation of the conditions of release."  Id. at 205-06 (second alteration in original; quotation marks and citations omitted). Therefore, "DOCCS's confinement of [petitioner] in an RTF, consistent with statutory authority, did not constitute indifference to his plight as a sex offender who is subject to SARA."  Id. at 206.

Like the petitioner in Johnson, Miller similarly asks that DOCCS release him to the Nassau County Department of Social

27

Services (hereafter, "Nassau DSS") without assurances of available SARA-compliant placement.   (See Injunction Application ¶1(a); see also Reply. Aff. ¶37.)   Miller "is a SARA-restricted parolee awaiting housing in Nassau County" who "will be released to Nassau DSS as soon as possible." (Singletary Decl. ¶¶5, 6.)   "However, there are other SARA-restricted parolees who have been awaiting housing for a longer period of time than he." (Id. ¶6.)   Moreover, while "Nassau County has several beds in four (4) shelters that are SORA[9]-approved" "each of those spaces is occupied[.]" (Haruthunian Decl., ECF No. 28-1, ¶9 (further noting "there are others awaiting for the first opening"); see also id. ¶9, n.2 ("The SORA-approved shelters are not exclusive to sex offenders; they house others as well.").)   Thus, given these considerations, DOCCS's confinement of Miller in an RTF, consistent with its statutory authority, does not constitute deliberate indifference to his plight as a sex offender who is subject to SARA.   See Johnson, 36 N.Y.3d at 206; see also People ex rel. McCurdy v. Warden, Westchester County Corr. Facility, 36 N.Y.3d 251 (N.Y. 2020)(discussing DOCCS's statutory authority to hold an individual on a PRS in an RTF for up to the first six months of the PRS term).

---

[9]   Declarant Haruthunian notes "Petitioner uses the term SARA. Upon information and belief, SARA and SORA refer to the same designation." (Singletary Decl. ¶8, n.1.)

Similarly, because there was a rational basis for denying approval of Miller's post-release placement in Mary's home, discussed supra, Miller is not likely to succeed with his Eighth Amendment claim on this basis. Therefore, in the absence of clearly showing a likelihood of success on the merits of this constitutional claim, preliminary injunctive relief is not warranted.

4. Plaintiffs' First Amendment Claims

(a)  Miller's First Amendment Retaliation Claim

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004)) (subsequent history omitted). Further, "[c]ourts are to approach First Amendment retaliation claims by prisoners with skepticism and particular care." Walker v. Senecal, No. 9:20-CV-0083, 2021 WL 3813081, at *4 (N.D.N.Y. July 19, 2021) (cleaned up), report & recommendation adopted by 2021 WL 3793771 (N.D.N.Y. Aug. 26, 2021).

Here, Plaintiffs appear to allege that in retaliation for Miller having commenced a state court action against Defendant

29

Stanford and others, which challenges the constitutionality of N.Y.S. Executive Law § 259-c(14) (hereafter, the "State Court Action"), Miller was placed in an RTF pending the availability of SARA-compliant housing. (See Compl. ¶¶24-49.) However, Plaintiffs cannot clearly show this cause of action is likely to succeed. For a level 3 sex offender like Miller, the SARA housing restriction is a mandatory condition of parole, which Miller acknowledges. (See Compl. ¶25); see also Miller v. Cuomo, Index No. 3898-20, slip op. at 7 (N.Y. Sup. Ct. Mar. 2, 2021) (hereafter, the "State Miller Ruling"[10]) (stating Miller "concedes that SARA is a 'mandatory condition' of his PRS" (citing N.Y.S. Exec. Law § 259-c(14)); McCurdy, 36 N.Y.3d at 254. Hence, the Court agrees with the State Defendants' argument that "the SARA housing restriction would have to be imposed as a condition of parole regardless of any lawsuit filed by Miller against any Defendant." (State Response at 14.) In turn, as the state court reasoned in denying Miller's motion to supplement his State Court Action by adding a claim of retaliation, a defendant "cannot be liable for retaliation if [he or] she would have taken the adverse action

---

[10]   In the State Miller Ruling, issued in Miller's State Court Action, the court granted in part the defendants' dismissal motions and denied Miller's motion to supplement his state court complaint to add, inter alia, a retaliation cause of action. (See State Miller Ruling, Ex. A, ECF No. 1-1, attached to Compl.)

even in the absence of the protected conduct." (State Miller Ruling at 7 (citing Murray v. Hulihan, 436 F. App'x 22 (2d Cir. Aug. 30, 2011).)  As a result, Plaintiffs cannot demonstrate a causal connection between the filing of his State Court Action and his placement in an RTF pending approval of SARA-compliant housing. Thus, Plaintiffs cannot meet the heightened standard for their requested preliminary injunction relying upon this First Amendment cause of action.

(b)  Mary's First Amendment Familial Association Claim

While "[p]arolees are . . . not without constitutional rights," United States ex rel Sperling v. Fitzpatrick, 426 F.2d 1161, 1164 (2d Cir. 1970), they are subject to "restrictions not applicable to other citizens," enjoying only "conditional liberty properly dependent on observance of special parole restrictions." Morrissey v. Brewer, 408 U.S. 471, 482 (1972); see also United States v. Polito, 583 F.2d 48, 54 (2d Cir. 1978) ("While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom . . . ." (cleaned up); see generally Trisvan v. Annucci, No. 14-CV-6016, 2016 WL 7335609, at *3 (E.D.N.Y. Dec. 16, 2016).  Indeed, as the State Defendants aptly argue: "A parole condition that incidentally affects a familial

31

relationship but does not prohibit familial contact does not violate the First Amendment." (State Response at 13.)

Here, Mary vaguely complains that her right of familial association guaranteed by the First Amendment has been violated. (See Compl. ¶122.) Without more, that is insufficient. Similarly, the allegation that Miller's time to contact Mary (and friends) has been curtailed to "BARELY" 15 minutes per day (see id. ¶78) since his relocation to an RTF does not make out a First Amendment freedom of association violation for the simple reason that Miller may still contact Mary. See, e.g., Daniels v. Ralph, No. 10-CV-0884, 2012 WL 2120591, at *8-9 (W.D.N.Y. June 11, 2012) (dismissing First Amendment familial association claim where parolee's parole condition did not forbid contact with family, even though it made such contact more difficult). Accordingly, Plaintiffs cannot make a clear showing of a likelihood of success on this claim; consequently, the granting of preliminary injunction relief is forestalled.

* * *

Because the party seeking a preliminary injunction must satisfy each factor of the analysis, see, e.g., Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 68 (2d Cir. 2007), and because the Court finds Plaintiffs are unable to clearly show a

likelihood of success on their constitutional claims, the Court need not consider the remaining preliminary injunction factors. See generally Pope v. County of Albany, 687 F.3d 565, 570 n.3 (2012) ("Because this appeal fails on the likelihood of success factor, we need not consider the balance of equities further."); Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (where movant failed to satisfy its burden of establishing a likelihood of success on the merits, "there is no need to address the other prongs of the [preliminary injunction] analysis). Further, to the extent not explicitly addressed, the Court has considered Plaintiffs' remaining arguments in favor of granting them preliminary injunctive relief and finds them unavailing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

## DISCUSSION REGARDING MILLER'S RECONSIDERATION MOTION[11]

### I.   The Legal Standard

"A motion for reconsideration should be granted only when the [movant] identifies an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 104 (2d Cir. 2013) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on

---

[11]  The Court notes that because Plaintiffs are represented by counsel, any pro se filings after Counsel Bandel's notice of appearance would ordinarily be denied. See 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." (emphasis added)); see also O'Reilly v. New York Times Co., 692 F.2d 863, 868 (2d Cir. 1982) ("Section 1654 does not itself confer any right to 'hybrid representation'". (quoting United States v. Wolfish, 525 F.2d 457, 462–63 (2d Cir. 1975) (subsequent history omitted))). However, it appears that Miller prepared and sent his pro se Reconsideration Motion before Counsel Bandel made his appearance in the case. Since the receipt of the Reconsideration Motion was, to a certain degree, outside of Miller's control and subject to the control of the U.S. Postal Service, in its discretion and in this instance only, the Court considers Miller's pro se Reconsideration Motion. **Plaintiffs are ON NOTICE:** The Court will not consider any other pro se filings while Plaintiffs are represented by counsel.

the merits, or otherwise taking a second bite at the apple." Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (internal quotation marks omitted) (quoting Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998)). Indeed, "[i]t is black letter law that a motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court[.]" Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Las Vegas Prof'l Football Ltd. P'ship, 409 F. App'x 401, 403 (2d Cir. 2010) (summary order) (internal quotation marks and citations omitted). The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." Analytical Surveys, 684 F.3d at 52 (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

II.  The Instant Case

Miller seeks reconsideration of that portion of the Court's Omnibus Order denying Plaintiffs' request for a TRO. (See ECF No. 19.)  As is apparent from the Court's discussion in denying the Plaintiffs' preliminary injunction, supra, it has neither overlooked controlling decisions cited in Miller's Reconsideration Motion nor any data. Moreover, to the extent Miller attempts to

advance new facts, issues, or arguments not previously presented to the Court via his Reconsideration Motion, it is not the proper vehicle to do so.  In any event, the Court GRANTS reconsideration. Upon reconsideration, however, the Court adheres to its initial ruling denying the Plaintiffs' request for a TRO for substantially the same reasons the Court denies the Plaintiffs' request for a preliminary injunction, supra, because "[t]he standard for an entry of a TRO is essentially the same as for a preliminary injunction."[12]  Free Country Ltd v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (citing Andino v. Fischer, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008); see id. (noting that a TRO "perhaps even more so than a preliminary injunction, is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'" (quoting JBR, Inc. v. Keurig Green Mountain, Inc., 618 F. App'x 31, 33 (2d Cir. 2015))).

---

[12] "A party seeking a TRO, like one seeking a preliminary injunction, must typically show four elements: (1) a likelihood of success on the ultimate merits of the lawsuit; (2) a likelihood that the moving party will suffer irreparable harm if a TRO is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by the relief granted."  Free Country, 235 F. Supp. 3d at 565 (quoting JBR, 618 F. App'x at 33).

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the portion of the Plaintiffs' Injunction Application (ECF No. 3) upon which the Court deferred ruling, i.e., the request for preliminary injunction, is **DENIED**; and

**IT IS FURTHER ORDERED** that Miller's pro se Reconsideration Motion (ECF No. 19) is **GRANTED**, but upon reconsideration, the Court adheres to its original ruling denying that portion of Plaintiffs' Injunction Application seeking a TRO; and

**IT IS FURTHER ORDERED** that this case is referred to Magistrate Judge Tomlinson for discovery purposes.

Finally, pursuant to 28 U.S.C. § 1915(a)(3), the COURT **CERTIFIES** that any appeal from this Order would not be taken in good faith; therefore, in forma pauperis status is **DENIED** for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

_/s/ JOANNA SEYBERT_
Joanna Seybert, U.S.D.J.

Dated:  September __16__, 2021
        Central Islip, New York

37